IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| SONIC INDUSTRIES LLC, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. CIV-22-449-PRW |
| | ) |
| OLYMPIA CASCADE DRIVE INS LLC, et al., | ) |
| | ) |
| Defendants. | ) |

## ORDER

Before the Court is Plaintiffs' Motion for Temporary Restraining Order (Dkt. 42) against Defendants Richard Ramsey and Olympia Cascade Drive-Ins, LLC. Because Defendants received notice and Plaintiffs' Motion is before the Court following a hearing in which all parties participated, the Court will treat the Motion as a motion for a preliminary injunction.[1] For the reasons that follow, the Motion (Dkt. 42) is **GRANTED.**

### *Background*

This case arises out of disputes between Sonic Industries LLC (and several of its affiliates—collectively, "Sonic") and several Sonic franchisees.[2] At issue in this motion

---

[1] *See TLX Acquisition Corp. v. Telex Corp.*, 679 F. Supp. 1022, 1028 (W.D. Okla. 1987); 11A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2951 (3d. ed. 2022). Additionally, Sonic has already moved for a preliminary injunction against Defendants. *See* Pls.' Mot. for Prelim. Inj. (Dkt. 4).

[2] On June 1, 2022, Sonic filed suit against several franchisees. Sonic's claims include (1) breach of contract related to franchise agreements, guaranty agreements, and promissory

1

are two of the defendant-franchisees: Richard Ramsey and Olympia Cascade Drive-Ins, LLC (collectively, "Defendants").[3] Relevant to this motion, Sonic alleges it properly terminated Defendants' license agreements (involving ten restaurants) for failure to cure monetary defaults and Defendants have nevertheless continued to hold themselves out as authorized Sonic franchisees.[4] Accordingly, Sonic seeks to enjoin Defendants from (1) infringing on Sonic's trademarks and service marks in violation of 18 U.S.C. § 1114(1); (2) unfairly competing with Sonic in violation of 18 U.S.C. § 1125(a); and (3) continuing to breach post-termination obligations.

*Findings of Fact*

Sonic entered into franchise agreements with Defendants to operate ten Sonic restaurant franchises.[5] In exchange for operating Sonic restaurant franchises and using Sonic's registered trademarks, Defendants agreed to pay royalties and other fees to Sonic. After Defendants failed to pay royalties and fees on a consistent basis for almost a year, Sonic sent Defendants a Notice of Default on September 2, 2021.[6] The notice advised Defendants that they currently owed $1,787,877 in unpaid fees and that the full

---

notes; (2) trademark and trade dress infringement under the Lanham Act; (3) unfair competition; and (4) breach of post-termination requirements and restrictions.

[3] Ramsey and Olympia Cascade Drive-Ins filed counterclaims against Sonic. However, for the sake of simplicity at this stage, the Court refers to them as "Defendants."

[4] The "Terminated Restaurants" are collected at Defs.' Mem. in Opp'n (Dkt. 18), at 7.

[5] At this stage, the Court makes factual findings based on an "evaluation of the salience and credibility of testimony, affidavits, and other evidence." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003).

[6] Ex. 12 (Dkt. 5), at 2–3.

amount must be paid within 30 days. If Defendants did not comply, the notice explained that Sonic intended to terminate the agreements at the end of those 30 days.

On November 29, 2021, after Defendants failed to pay the fees owed, Sonic sent Defendants a Notice of Termination.[7] While explaining that Sonic was entitled to immediately terminate the agreements, Sonic explained that it was allowing Defendants to operate the restaurants for an additional 90 days (or until February 29, 2022) to give Defendants an opportunity to sell the restaurants. To exercise the 90-day extension, Defendants were required to submit a letter to Sonic by December 10, 2021. Defendants never sent the letter but continued to operate the restaurants. Finally, the notice explained that Defendants were still required to pay the now $2,141,905 in owed fees.

On December 30, 2021, Sonic sent another letter to Defendants.[8] The letter explained that since Defendants had not exercised the 90-day extension or cured the fees owed, Sonic was entitled to immediately terminate the agreements. However, Sonic gave Defendants an additional ten days to exercise the 90-day extension option. Defendants never exercised the extension but continued to operate the restaurants. Finally, the letter once again explained that Defendants were still required to pay the now $2,238,393 in owed fees.

Sometime between January and February 2022, Defendants notified Sonic that they were negotiating a sale of the restaurants, and Sonic gave Defendants until March 1, 2022,

---

[7] Ex. 13 (Dkt. 5), at 2–4.
[8] Ex. 14 (Dkt. 5), at 2–4.

to facilitate the sale. But by April 4, 2022, Defendants had provided no further proof of sale, and Sonic sent Defendants another letter.[9] This letter informed Defendants that they were required to close on any sale by May 4, 2022, or their franchise agreements would be terminated on that date and Defendants would be required to cease operation and comply with the agreement's post-termination obligations. Finally, the letter once again explained that Defendants were still required to pay the now $2,534,716 in owed fees.

Finally, on May 11, 2022, Sonic sent Defendants a Notice of Immediate Termination.[10] Because Defendants had not finalized sale of the restaurants or cured the owed fees, Sonic ordered Defendants to immediately cease all operations, "deidentify" the restaurants (i.e., no longer hold them out as Sonic franchises), and pay the now $2,756,355 in owed fees. Sonic advised Defendants that if they did not comply within 10 days, Sonic would initiate legal action. Defendants failed to comply.

Defendants have made no fee-related payments to Sonic since October 2021. Throughout this entire period, Defendants have not disputed that they owe Sonic at least $800,000 in fees under the franchise agreements. To this day, Defendants' restaurants continue to operate under the Sonic mark and hold themselves out to the public as Sonic franchisees.

### *Legal Standard*

The purpose of a preliminary injunction is "to enjoin, pending the outcome of the

---

[9] Ex. 15 (Dkt. 5), at 2–4.

[10] Ex. 16 (Dkt. 5), at 2–3.

litigation, action that [the movant] claims is unlawful."[11] A preliminary injunction is an "extraordinary remedy" which is never "awarded as of right."[12] A party may be granted a preliminary injunction only when monetary or other traditional remedies are inadequate, and "the right to relief [is] clear and unequivocal."[13] The Court may enter a preliminary injunction if (1) Sonic is substantially likely to succeed on the merits; (2) Sonic will suffer irreparable injury if the injunction is denied; (3) Sonic's threatened injury outweighs the injury Defendants will suffer under the injunction; and (4) the injunction would not be adverse to the public interest.[14] As the movant, Sonic bears the burden to establish that each of these factors tips in its favor.[15] Additionally, Sonic's requested TRO would alter the status quo. Because such injunctions are "disfavored," Sonic must make a "strong showing both with regard to the likelihood of success on the merits and with regard to the balance of the harms."[16]

## *Discussion*

For the reasons that follow, the Court finds that Sonic has met its burden for a preliminary injunction.

---

[11] *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 314 (1999).
[12] *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008).
[13] *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005).
[14] *Fish v. Kobach*, 840 F.3d 710, 723 (10th Cir. 2016).
[15] *Heideman*, 348 F.3d at 1188.
[16] *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 976–77 (10th Cir. 2004).

*A. Likelihood of Success on the Merits.*

First, Sonic has met its burden to establish that it is likely to succeed on the merits.[17] To succeed on the merits of its Lanham Act claims, Sonic must prove "that (1) its mark was used in commerce by [Defendants] without [Sonic's] consent and (2) the unauthorized use was likely to cause confusion, or to cause mistake or to deceive."[18] In this context, to show an "unauthorized trademark," Sonic must show that it "properly terminated the contract purporting to authorize the trademarks' use[.]"[19] If Sonic can make that showing, the Court "may presume that the unauthorized use was likely to cause confusion, or to cause mistake or to deceive."[20]

*1. Sonic properly terminated the franchise agreements.*

To start, Sonic "properly terminated the contract purporting to authorize the trademarks' use[.]"[21] Defendants do not dispute that they have failed to pay fees owed under the agreements. Nor do they dispute that Sonic was permitted to terminate the franchise agreements for Defendants' failure to pay the required fees. Defendants,

---

[17] Sonic's post-termination obligation claim and Lanham Act claims are intertwined. Defendants do not dispute that if Sonic succeeds on its Lanham Act claims, then it will also succeed on its post-termination obligation claim. Because Sonic has met its preliminary injunction burden as to the Lanham Act claims, the Court does not separately address the related post-termination obligation claim.

[18] *Burger King Corp. v. Mason*, 710 F.2d 1480, 1491 (11th Cir. 1983) (citing 15 U.S.C. § 1114(1)(a)); *see also S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 376 (3d Cir. 1992).

[19] *Hetronic Int'l, Inc. v. Hetronic Germany GmbH*, 2019 WL 3003679, at *32 (W.D. Okla. Mar. 22, 2019) (emphasis omitted).

[20] *Sonic Indus., LLC v. Simple Tie Ventures, LP*, 2020 WL 4783917, at *4 (W.D. Okla. July 23, 2020).

[21] *Hetronic Int'l, Inc.*, 2019 WL 3003679, at *32.

however, maintain that Sonic's termination was improper. None of the arguments advanced by Defendants are persuasive.

First, Defendants take issue with the content of Sonic's termination notices. They argue that (1) Sonic failed to provide the precise amount of franchise fees owed by each individual franchise unit and (2) Sonic did not provide a consistent or accurate total of fees owed. But Defendants cite to no provision of the franchise agreements that requires the type of restaurant-by-restaurant breakdown in fees owed.[22] Nor does Defendants' claim regarding the constantly changing total amount owed appear to signal faulty notice. As Sonic's Vice President of Finance and Treasurer explained, the amount owed by Defendants continued to increase because Defendants did not make a single payment on their current or past due fees after October 2021.[23] Further, Sonic has provided detailed evidence for its calculations of the amount owed by Defendants.[24] Based on an "evaluation of the salience and credibility of testimony, affidavits, and other evidence"[25] presented, the Court finds that Sonic provided proper notice of the amount owed. At best, what Defendants are left with is a dispute over the precise amount owed to Sonic—Defendants concede that they owe significant sums. But franchisees cannot avoid termination of

---

[22] At oral argument, Defendants' counsel conceded that nothing in the agreement requires such a breakdown.

[23] Ex. 1 (Dkt. 29), at 4.

[24] *See, e.g.*, Ex. 12 (Dkt. 5), at 4–11; Ex. 13 (Dkt. 5), at 5–14; Ex. 14 (Dkt. 5), at 5–15; Ex. 15 (Dkt. 5), at 5–16; Ex. 16 (Dkt. 5), at 4–13; Ex. 1 (Dkt. 29); Exs. 9–11 (Dkt. 29). Although Defendants have claimed that these calculations were made in bad faith, they have not put forth sufficient evidence to support this claim.

[25] *Heideman*, 348 F.3d at 1188.

franchise agreements by disputing only some portion of the amount owed if they concede they owe other amounts.[26] Failure to pay even the amount Defendants concede they owe would justify termination.

Second, Defendants argue that Sonic's termination was improper under Washington state law and Rule 19 of the Federal Rules of Civil Procedure because Sonic failed to notice and join certain co-licensees. But Sonic has put forth evidence that those entities were sold to Defendants and administratively dissolved several years ago.[27] And there is little dispute that Defendants are currently the sole operators of the restaurants. In any event, since all relevant co-licensees were administratively dissolved more than three years ago, the Washington law Defendants rely on prohibits Sonic from suing the co-licensees.[28] And Defendants have not made a sufficient showing that any of the Rule 19 factors require joinder.

Finally, Defendants argue that Sonic's termination failed to comply with the notice and termination provisions of the Washington Franchise Investment Protection Act (WFIPA).[29] But WFIPA is not a barrier to Sonic's success on the merits. WFIPA's text does not address the content of notices of default, and Defendants point to no caselaw

---

[26] *See, e.g.*, *Simple Tie Ventures, LP*, 2020 WL 4783917, at *4; *Tim Hortons USA, Inc. v. Tims Milner LLC*, 2019 WL 7376768, *3–4 (S.D. Fla. July 23, 2019); *Krispy Kreme Doughnut Corp. v. Satellite Donuts, LLC*, 725 F. Supp. 2d 389, 395 (S.D.N.Y. 2010); *Tsunami Softgoods, Inc. v. Tsunami International, Inc.*, 2001 WL 670926, at *4 (D. Utah Jan. 19, 2001).

[27] *See* Ex. 5 (Dkt 29), at 2; Ex. 6 (Dkt. 29).

[28] *See* Wash. Rev. Code § 25.15.309(1).

[29] Wash. Rev. Code § 19.100.180.

interpreting the act to require any particular type of notice. Instead, WFIPA merely states that a franchise agreement may only be terminated "prior to the expiration of its term . . . for good cause."[30] The act then defines good cause as including, "without limitation, the failure of the franchisee to comply with lawful material provisions of the franchise or other agreement between the franchisor and the franchisee[.]"[31] Once a franchisee breaches a material provision, the franchisor may terminate after a reasonable opportunity to cure has been given, which the statute defines as: (1) 30 days after written notice; or (2) if the "default cannot reasonably be cured within thirty days," upon "the failure of the franchisee to initiate within thirty days substantial and continuing action to cure."[32]

Sonic's termination complied with all aspects of WFIPA. Sonic had good cause to terminate the agreement when Defendants failed to pay fees owed under the agreement, a material and lawful term. Sonic also complied with the notice and cure provisions. Sonic provided a notice of default on September 2, 2021, which gave Defendants 30 days to cure.[33] Defendants did not cure, nor did they "initiate within thirty days substantial and continuing action to cure."[34] It was only after the 30-day cure period that Sonic moved to terminate the agreements.[35] Therefore, Sonic properly terminated the franchise agreement.

---

[30] § 19.100.180(j).

[31] *Id*.

[32] *Id.*

[33] Ex. 12 (Dkt. 5), at 2–3.

[34] Wash. Rev. Code § 19.100.180(j); *see* Ex. 1 (Dkt. 29), at 4.

[35] Sonic moved to terminate the agreements on November 29, 2021. *See* Ex. 13 (Dkt. 5), at 2–4.

2. *Sonic is likely to succeed on its Lanham Act claims.*

To succeed on the merits of its Lanham Act claims, Sonic must prove "that (1) its mark was used in commerce by [Defendants] without [Sonic's] consent and (2) the unauthorized use was likely to cause confusion, or to cause mistake or to deceive."[36] Defendants do not dispute that they used Sonic's marks in commerce, and because the agreement was terminated, the use was without Sonic's consent. Given this finding, the Court "may presume that the unauthorized use was likely to cause confusion, or to cause mistake or to deceive."[37] "When a franchisee—who once had authorization becomes associated in the public mind with the licensor or franchisor—loses authorization but continues use of the franchisor's mark, the potential for consumer confusion is great because the public is fraudulently 'led to think that the ex-licensee is still connected with the licensor.'"[38] Because of this, "it is a well-settled doctrine that a terminated franchisee's continued use of its former franchisor's trademarks, by its very nature, constitutes trademark infringement."[39] Defendants do not dispute that if the agreements were properly terminated, then the likelihood of confusion element is met. Therefore, Sonic is likely to succeed on its Lanham Act claims.

---

[36] *Mason*, 710 F.2d at 1491 (citing 15 U.S.C. § 1114(1)(a)); *see also S & R Corp.*, 968 F.2d at 376.

[37] *Simple Tie Ventures, LP*, 2020 WL 4783917, at *4.

[38] *IHOP Franchising, LLC v. Tabel*, 2014 WL 1767199, at *9 (D. Kan. Apr. 15, 2014) (quoting *7–Eleven, Inc. v. Spear,* 2011 WL 830069, at *5 (N.D. Ill. Mar. 3, 2011)).

[39] *Spear,* 2011 WL 830069, at *5.

*B. Irreparable Harm.*

Second, Sonic has met its burden to establish that it will suffer irreparable harm if the injunction is denied. This factor is satisfied by a movant demonstrating that there is a significant risk of harm that cannot be cured by monetary damages.[40] "To assess the significance of that risk, [courts] may consider the difficulty in calculating damages, the loss of a unique product, and existence of intangible harms such as loss of goodwill or competitive market position."[41] In addition to being irreparable, the harm must also be likely to occur before a decision on the merits can be rendered; mere speculative harm is not enough.[42]

In the context of trademark infringement, the Trademark Protection Act of 2020 ("TMA") recently created a rebuttable presumption of irreparable harm upon a finding of likelihood of success on the merits.[43] Under the TMA, "If the plaintiff's evidence does establish likely trademark infringement, [the presumption] is triggered, and the burden of

---

[40] *Greater Yellowstone Coal. v. Flowers,* 321 F.3d 1250, 1258 (10th Cir. 2003); *accord Trial Laws. Coll. v. Gerry Spence Trial Laws. Coll. at Thunderhead Ranch*, 23 F.4th 1262, 1270 (10th Cir. 2022) ("For irreparable injury, the [movant] had to prove a significant risk of harm that couldn't be compensated after the fact.") (cleaned up).

[41] *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1264 (10th Cir. 2004) (cleaned up).

[42] *Winter*, 555 U.S. at 22.

[43] *See* 15 U.S.C. § 1116(A). Until recently, this was not the rule. Congress added this amendment to the Lanham Act through the TMA. Pub. L. No. 116-260, H.R. 133, 116th Cong. subtit. B, §§ 221–26 (2020). The provision was passed to remedy the impact on trademark cases of *eBay Inc. v. MercExchange*, 547 U.S. 388 (2006), where the Supreme Court held that there is no presumption of irreparable harm in patent infringement cases. *See* H.R. Rep. No. 116-645, at 16–19 (2020). Several lower courts had extended *eBay*'s rule to trademark infringement actions. *See id.*

production shifts to the defendant to introduce evidence sufficient for a reasonable factfinder to conclude that the consumer confusion is unlikely to cause irreparable harm."[44] In this respect, the "presumption means the court assumes irreparable harm, even if the plaintiff has proffered nothing in support."[45] The focus then turns to the "defendant's evidence, and whether it is sufficient to rebut the . . . presumption."[46] If the defendant's evidence successfully rebuts the presumption, the burden then "returns to the plaintiff to point to evidence that irreparable harm is likely absent an injunction."[47] The court then applies traditional principles of equity to determine whether the plaintiff's evidence is sufficient to constitute irreparable harm.

Having concluded that Sonic is likely to succeed on the merits of its trademark infringement claim, the TMA's presumption applies, and the burden shifts to Defendants "to introduce evidence sufficient for a reasonable factfinder to conclude that the consumer confusion is unlikely to cause irreparable harm."[48] Defendants have not carried their

---

[44] *Nichino America, Inc., v. Valent USA, LLC*, 2022 WL 3331290, at *3 (3d Cir. Aug. 12, 2022) (designated for publication).

[45] *Id.*

[46] *Id.*

[47] *Id.*

[48] *Id.*

burden. They have presented no evidence sufficient to rebut the TMA's presumption.[49] In such an instance, the TMA requires courts to find that a threat of irreparable harm exists.[50]

Even if Defendants did carry their burden, Sonic has "point[ed] to evidence that irreparable harm is likely absent an injunction."[51] Courts have long recognized that unauthorized use of a trademark by a former franchisee almost always causes irreparable harm because the franchisor loses control over the reputation of the mark,[52] customers will be confused as to the franchisees' status,[53] and the franchisor can no longer monitor use of the mark to ensure quality control.[54] "[I]f [f]ranchisees fail to provide the quality of service customers expect, customers will almost certainly attribute the poor service to [the

---

[49] At oral argument, Defendants' counsel suggested that irreparable harm may not exist because Sonic has not shown that the number of complaints against Defendants' restaurants is unusual or greater than an ordinary Sonic restaurant. But this argument misses the point. Since the agreements have been terminated, Sonic no longer has the right to control the operations of Defendants' restaurants. Thus, regardless of the number, Sonic has lost the ability to remedy any such complaints and protect against the harm to its reputation from any such complaint. This loss of control constitutes irreparable harm. *See TGI Friday's, Inc. v. Great Nw. Restaurants, Inc.,* 652 F. Supp. 2d 763, 771 (N.D. Tex. 2009).

[50] *See, e.g.*, *Nintendo of Am., Inc. v. Storman*, 2021 WL 4772529, at *2 (C.D. Cal. Aug. 5, 2021); *see Nichino America, Inc.,* 2022 WL 3331290, at *3.

[51] *Id.*

[52] *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 25 (2d Cir. 2004) ("There is a compelling need for injunctive relief especially when the case involves a former licensee because, after a license has been revoked, there is an increased danger that consumers will be confused and believe that the former licensee is still an authorized representative of the trademark holder. Thus, when in the licensing context unlawful use and consumer confusion have been demonstrated, a finding of irreparable harm is automatic.") (cleaned up).

[53] *See Trial Laws. Coll.*, 23 F.4th at 1270–73.

[54] *See TGI Friday's, Inc.*, 652 F. Supp. 2d at 771.

13

franchisor] and could be discouraged from returning to other [] franchises in the future."[55] Such loss in control, customer satisfaction, and goodwill constitutes irreparable harm.[56]

Here, the evidence presented to the Court suggests that such irreparable harm is likely absent an injunction. Since Sonic terminated the agreements and lost the ability to monitor and control the restaurants, there have been reports of serious quality control problems, including: multiple reports of serving raw or undercooked chicken or beef; rancid drinks and shakes; hair and gnats in food; and mildew in food.[57] Further, since the restaurants have lost access to Sonic's suppliers, they have started selling non-Sonic products under the Sonic mark. It is clear that Sonic has lost control over Defendants' restaurants, that Sonic can no longer monitor the use of the mark to ensure quality control,

---

[55] *Petro Franchise Sys., LLC v. All Am. Props., Inc.,* 607 F. Supp. 2d 781, 795 (W.D. Tex. 2009).

[56] *See Hill's Pet Nutrition, Inc. v. Nutro Prods., Inc.,* 258 F. Supp. 2d 1197, 1205 (D. Kan. 2003). And for good reason. As other circuits have recognized, such damages to a trademark holder are difficult to quantify in monetary damages. *See, e.g.*, *Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 805 (8th Cir. 2003) ("Harm to reputation and goodwill is difficult, if not impossible, to quantify in terms of dollars."); *Am. Hosp. Supply Corp. v. Hosp. Prods. Ltd.*, 780 F.2d 589, 611 (7th Cir. 1986) (finding that damages could not adequately compensate the plaintiffs in part because the injury to their reputations and goodwill were "extremely difficult to calculate").

[57] Again, as explained above, it is Sonic's inability to remedy the issues at Defendants' restaurants, not the precise number of complaints, that is relevant here. *See Simple Tie Ventures, LP*, 2020 WL 4783917, at *5 (explaining that even if Sonic "failed to provide any evidence of customer complaints, that Defendants would intentionally injure the Sonic brand, or that Defendants are failing to meet Sonic standards" irreparable harm would still exist because "Sonic would lack any proof that Defendants are failing to meet standards as it can no longer inspect for quality control and a party does not need to wait until the injury occurs to demonstrate irreparable harm; a preliminary injunction is meant to *prevent* irreparable harm").

and "that customers will almost certainly attribute the poor service to" Sonic.[58] Therefore, even if the TMA's presumption were rebutted, Sonic has established that irreparable harm is likely absent an injunction.

## C. Balance of Harms.

Third, Sonic has met its burden to establish that Sonic's threatened injury outweighs the injury Defendants will suffer under an injunction. This factor requires the Court to balance the harm that might be suffered by Defendants if the injunction were issued against the injury that would result to Sonic if the injunction were denied. In trademark infringement cases, the balance of harms analysis generally favors the trademark holder[59]—here, Sonic—even where the issuance of injunctive relief may cause "substantial harm" to the infringer.[60] This is because "[o]ne who adopts the marks of another for similar goods acts at his own peril since he has no claim to the profits or advantages thereby derived."[61]

Defendants' arguments about the impact of an injunction on their restaurants do not alter the balance of harm in favor of Sonic. "[W]hen the case for infringement is clear, a defendant cannot avoid a preliminary injunction by claiming harm to a business built upon

---

[58] *Petro Franchise Sys., LLC*, 607 F. Supp. 2d at 795. As noted below, the customer complaints present in the record show that customers are attributing the service at Defendants' restaurants to Sonic.

[59] *See Krause Int'l Inc. v. Reed Elsevier, Inc.*, 866 F. Supp. 585, 587–88 (D.D.C. 1994).

[60] *ReBath LLC v. Foothills Serv. Sols. Co.*, 2021 WL 2352426, at *12 (D. Ariz. June 9, 2021) (collecting cases).

[61] *Burger King Corp. v. Majeed*, 805 F. Supp. 994, 1006 (S.D. Fla. 1992).

that infringement."[62] Any harm to Defendants is self-inflicted—a product of their own failure to comply with the franchise agreements—and "courts afford little weight to self-inflicted harms when conducting the balancing inquiry."[63] Therefore, the balance of harms favors Sonic.

D. *Public Interest.*

Fourth, Sonic has met its burden to establish that the injunction would not be adverse to the public interest. When a movant has established it properly a terminated license agreement, defendants are now engaged in the unauthorized use of a trademark, and irreparable harm exists from loss of control over the defendant's use of the mark, injunctive relief is in the public interest.[64] That is because in this context "the public interest . . . is often defined as the right of the public not to be deceived or confused."[65] And the only way to prevent public confusion or deception is to enjoin the offending party from use of the mark. Otherwise, the offending party can continue to hold itself out to the public as a licensee of the movant.

---

[62] *GMC v. Urban Gorilla, LLC*, 500 F.3d 1222, 1229 (10th Cir. 2007).

[63] *Equitable Nat'l Life Ins. Co. v. AXA Equitable Life Ins. Co.*, 434 F. Supp. 3d 1227, 1255 (D. Utah 2020); *see, e.g., S & R Corp.*, 968 F.2d at 379 ("[Franchisee] is certainly harmed by the threat of loss of his franchise, but his self-inflicted harm is far outweighed by the immeasurable damage done [to the trademark holder] by the infringement of its trademark.")

[64] *See, e.g., Church of Scientology Int'l v. Elmira Mission of Church of Scientology,* 794 F.2d 38, 44 (2d Cir. 1986); *Mason*, 710 F.2d at 1493; *United States Jaycees v. Philadelphia Jaycees,* 639 F.2d 134, 142 (3d Cir. 1981); *Simple Tie Ventures, LP*, 2020 WL 4783917, at *7 (finding an injunction in the public interest in a Sonic franchisee dispute similar to the case now before the Court); *IHOP Franchising, LLC*, 2014 WL 1767199, at *13.

[65] *Tsunami Softgoods, Inc.*, 2001 WL 670926, at *6.

16

So too here. Defendants are continuing to falsely hold themselves out to the public as Sonic licensees. Their conduct is likely to deceive and confuse the public by putting off the impression that they are providing Sonic's licensed services and that their conduct represents the Sonic brand.[66] The only way to prevent this confusion and deception is to enjoin Defendants from use of Sonic's mark.

Further, the public interest is served when contractual obligations are enforced and disserved when contractual obligations are not enforced.[67] That is because the enforcement of contracts promotes predictability and stability in the national economy. Enjoining Defendants will serve the public interest by promoting predictability and stability in contractual relations.

E. *Security.*

Finally, having concluded that all four preliminary injunction factors weigh in favor of Sonic, the Court must consider whether to require Sonic to give a security.[68] Rule 65(c) of the Federal Rules of Civil Procedure provides that a preliminary injunction may issue "only if the movant gives security in an amount that the court considers proper." The

---

[66] As Sonic's counsel pointed out at oral argument, the fact that customers are submitting complaints to Sonic about Defendants' restaurants shows that customers believe the restaurants are providing Sonic's licensed services and that their conduct represents the Sonic brand.

[67] *Amedisys, Inc. v. Interim Healthcare of Wichita, Inc.*, 2015 WL 1912308, at *3 (D. Kan. Apr. 27, 2015); *Retiree, Inc. v. Anspach*, 2013 WL 3820729, at *7 (D. Kan. July 23, 2013); *Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc.,* 86 F. Supp. 2d 1102, 1109 (D. Kan. 2000); *Hearton, Inc. v. Shackelford,* 898 F. Supp. 1491, 1502 (D. Kan. 1995); *Burger King Corp. v. Lee*, 766 F. Supp. 1149, 1157 (S.D. Fla. 1991).

[68] *See* Fed. R. Civ. P. 65(c).

purpose of a security is to protect the non-moving party against any harms incurred should it be determined later that the injunction was improper.[69] District courts have broad discretion in determining whether to require a movant to post a security and in setting the amount.[70] This is particularly so when the movant has substantial sources of revenue and the non-movant has made no showing that harm will likely occur in the absence of a security.[71]

The Court finds that a security is unnecessary because Defendants have not shown a likelihood of harm absent a security.[72] Sonic has substantial sources of revenue and would be able to reimburse Defendants for any harms incurred should it be determined later that the injunction was improper.

*Conclusion*

Sonic has established (1) a likelihood of success on the merits; (2) irreparable harm; (3) the harm to Sonic outweighs the harm to Defendants; and (4) the public interest will be served by an injunction. Accordingly, Sonic's motion for preliminary injunction against Richard Ramsey and Olympia Cascade Drive-Ins, LLC is **GRANTED**.[73] Further, the

---

[69] *See* Wright & Miller, *supra*, § 2954.

[70] *Coquina Oil Corp. v. Transwestern Pipeline Co.,* 825 F.2d 1461, 1462 (10th Cir. 1987) ("[A] trial court may, in the exercise of discretion, determine a bond is unnecessary to secure a preliminary injunction 'if there is an absence of proof showing a likelihood of harm.'") (quoting *Continental Oil Co. v. Frontier Refining Co.,* 338 F.2d 780, 782 (10th Cir. 1964)); *Dominion Video Satellite, Inc.*, 269 F.3d at 1158.

[71] *Cf. Winnebago Tribe of Nebraska v. Stovall*, 216 F. Supp. 2d 1226, 1239–40 (D. Kan. 2002); *Coquina Oil Corp.*, 825 F.2d at 1462.

[72] *See id.*

[73] This order does not apply to any of the other defendants in this case.

security requirement is waived. Based on the foregoing, it is hereby **ORDERED** as follows:

A. Defendants, their officers, agents, servants, parents, subsidiaries, affiliates, attorneys, and employees, and those persons in active concert or participation with them are enjoined from operating the Terminated Restaurants as Sonic restaurants, and more specifically are enjoined from:

   1. Using the Sonic marks or any trademark, service mark, trade dress, logo or trade name that is confusingly similar to any of the Sonic marks in connection with the terminated restaurants;

   2. Otherwise infringing the Sonic marks or using any similar designation, alone or in combination with any other components in connection with the terminated restaurants;

   3. Committing any other act which falsely represents or which has the effect of falsely representing that the goods and services of defendants are licensed by, authorized by, offered by, produced by, sponsored by, or in any other way associated with Sonic;

   4. Misrepresenting any of their products or services as those of Sonic or Sonic authorized franchisees in connection with the terminated restaurants;

   5. Causing a likelihood of confusion or misunderstanding as to their affiliation, connection or association with Sonic and Sonic-authorized franchisees or any of Sonic's products or services; and

   6. Engaging in any activity constituting unfair competition under the Lanham Act against Sonic or its franchisees.

B. Defendants shall file with the Court and serve upon Sonic's counsel, within ten (10) days hereof, a written report, under oath, setting forth in detail the manner in which they have complied with this order.

   **IT IS SO ORDERED** this 24th day of August 2022.

PATRICK R. WYRICK
UNITED STATES DISTRICT JUDGE